COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| HAMPSHIRE, SS. | SUPERIOR COURT<br>DEPARTMENT OF THE TRIAL COURT<br>CIVIL ACTION NO.<br>09-30233-MAP |
| MJ PROMOTIONS, INC., and<br><br>MI GREAT IDEAS, INC., and<br><br>SELECT MARKETING AND<br>DISTRIBUTION, INC.,<br>　　　　Plaintiffs<br><br>v.<br><br>RBS CITIZENS, N.A.,<br><br>　　　　Defendant | **AFFIDAVIT OF JAYME A. PARRO** |

NOW COMES Jayme A. Parro, and making this Affidavit under the pains and penalties of perjury, states that the allegations contained herein are true and are based upon personal knowledge and belief.

1. My name is Jayme A. Parro and I reside at 6 Overlook Drive, Belchertown, Massachusetts.

2. I have been a long time customer of RBS Citizens, N.A. ("Citizens") and do banking primarily at the Citizens Bank branch located at 33 South Main Street, Belchertown, Massachusetts.

3. I am the President of Select Marketing and Distribution, Inc. ("Select"), a Massachusetts domestic company with 15-20 employees. Select came into existence in June, 2008 via the purchase of assets of a competitor.

4. My wife, Marilyn Iannaccone, is President of MJ Promotions, Inc., a Massachusetts corporation that was organized in March of 2008, was voluntarily dissolved on or about November 16, 2009 and is in the "wind down period" provided by Mass. General Laws Chapter 156D § 14.02.

5. In August, 2009 MJ Promotions, Inc. ("MJ") purchased hollow fiber pillows and sheet and pillowcase sets from Jiangsu Holly Corporation ("Holly").

6. MJ had a longstanding business relationship with Holly and had purchased goods from Holly in the past. Holly had previously extended credit to MJ for these purchases. MJ and Holly had an arrangement where purchases were secured by a $25,000.00 down payment and the remaining balance would be paid at the time the goods arrived in the USA. When MJ was unable to make payment as agreed to above, Holly traditionally extended payment terms where necessary.

7. MJ's initial order with Holly was for 3 HQ containers of sheet sets for which MJ paid approximately a 30% down payment on an approximate order of $250,000. As my memory serves, MJ was to pay in full for the balance of the order prior to the HQs leaving China and did so.

8. Over the next several years, MJ ordered increasing larger production runs upwards of 12 HQs at a time[1]. As a relationship developed with Seth at Holly, MJ asked for payment terms. It was agreed that to secure any order a $25k down payment would be made. The balance would be paid at the time the individual HQs arrived in the USA. This arrangement worked well as it alleviated MJ's cash flow issues as the order volumes expanded. This did not always flow

smoothly as there were many times when the HQs would arrive and MJ did not have the monies to forward Holly, yet MJ always paid off the full value of orders with the co-operation of Holly who extended payment terms where necessary in exchange for increased business from MJ.

9. Holly put MJ in touch with a Chinese company called Sinosure who would guarantee the purchases for Seth up to $100k, whereas MJ would have 20 days to pay for each HQ after delivery.

10. In July 2009, MJ placed an order for 3 HQs of sheet sets and 9 HQs of pillows. Holly assured MJ that the $25k was a sufficient down payment and MJ would have 20 days after receipt of goods to pay.

11. In August, 2009, Holly requested that invoices and bills of lading for new purchases be sent to MJ's Bank. They requested and were provided with the mailing address of Citizens Bank, 33 South Main Street, Belchertown, Massachusetts where we maintain our accounts. MJ and its agents, including myself, were unfamiliar with why such a request was being made however we acquiesced.

12. On diverse dates in August, 2009 Marilyn Iannaccone, was contacted by representatives of Citizens and advised that there were packages delivered for MJ to the Bank and were available for pick up. Marilyn or I then went to the Citizens branch in Belchertown and were given bills of lading and invoices related to the Holly transactions.

13. I picked up 1 package of the bills of lading at the Citizens Branch in Belchertown. The package was handed to me by the manager, Katie, and was

---

[1] HQ is a shipping container that is 1 foot taller than a standard 8'9" container.

unopened at the time I received it. I opened the package and inside were copies of the bills of lading only. It was my understanding that MJ would only need to pay within 20 days after receipt of the freight. The original bill of lading was required to actually receive the freight from the port as the ocean vessel transport company will not release any freight without the original bill of lading.

14. The second DHL delivery was lost in transit and somehow ended up in West Hartford and needed to be redirected to Belchertown. At this time the 4th HQ was arriving into port. MJ asked Holly if there was any way of getting the HQ released without the bill of lading. Holly telex released the bill of lading to the freight company.

15. MJ sold the goods at a profit to Select Marketing and Distribution, Inc. ("Select"), an entity which is separate and apart from MJ. Select paid reasonable market rates in an arms-length transaction for the goods.

16. Select sells goods to individual consumers. It also obtains and uses valuable prime space at various consumer and trade shows throughout the country.

17. Had MJ been aware of the unilateral change in terms of the transaction with Holly, i.e. essentially a "cash on delivery" transaction from a credit transaction, MJ would have refused to accept the bill of lading and possession of the goods.

18. MJ's business model is such that maintaining credit with its suppliers is a key component and issue of material concern to the business.

19. In early November Katie, Manager of the Citizens Branch in Belchertown, asked me about the status of the payments to Holly. Katie asked that someone contact Beth Ridder on behalf of MJ and Marilyn forwarded the number to Kevin Crigger,

an agent of and consultant to MJ. Kevin contacted Ridder and explained the situation. He advised Ridder of the agreed upon payment terms for MJ, and based on this also stated that Citizens, from MJ's perspective, really should not have any involvement in this transaction. He forwarded copies of documentation he received from MJ and asked Ridder to contact him directly should she require any additional information or require clarification. T o my knowledge Beth did not return his calls after their initial discussion. Katie asked me to please deal with this in a timely manner as her job was in jeopardy as she was supposed to have handled the paperwork in a different manner.

20. On December 17, 2009 at approximately. 11am, my wife called me panicking that MI, MJ, Select and her own personal accounts at Citizens showed a zero balance. I immediately called Citizens and was advised that the bank accounts did in fact show true balances, yet the funds were on hold and a contact number was to be called. I immediately called the number and spoke with Ridder, who told me that the accounts were "frozen" due to lack of payment to the Bank of China. I advised her this matter had nothing to do with Citizens Bank or Bank of China and she assured me that from Citizens' perspective it 100% did. She stated that Katie was supposed to have forwarded the August documents to the International Department at Citizens and this protocol had not been followed. I advised her this had nothing to do with MJ, MI or Select. I immediately called Kevin Crigger, who in turn called her multiple times, and was not able to successfully reach her.

21. On or about December 17, 2009, my wife and I learned that Citizens Bank had, without prior notice, denied access to funds on deposit with the bank as set forth below:

| | | |
|---|---|---|
| MJ Promotions, Inc. | account no. xxxxxx2316 | $13,364.13 |
| MJ Promotions, Inc. | account no. xxxxxx6554 | $3,138.74 |
| MI Great Ideas, Inc. | account no. xxxxxx6621 | $25,414.25 |
| Select Marketing and Distribution, Inc. | account no. xxxxxx4616 | $83,957.41 |
| Select Marketing and Distribution, Inc. | account no. xxxxxx4626 | $8,060.58 |
| Marilyn Iannaccone | account no. xxxxxx3706 | $141.31 |
| Marilyn Iannaccone | account no. xxxxxx4268 | $5,738.04 |
| TOTAL | | $139,814.46 |

22. MI Great Ideas, Inc. ("MI") primarily manages intellectual property and licensing rights and is legally unrelated to the other companies. It has in the past purchased and sold cosmetic to Select. MJ purchases goods and sells them to other distributers, including Select.

23. Select sells goods to individual retail consumers primarily through trade shows and fairs.

24. Any transactions by and between all of the listed companies are at arms length and at commercially reasonable rates.

25. Select is a corporation in which I have responsibilities as an officer and director. The company maintains the proper corporate forms, does not comingle funds with MI or MJ, and properly documents all transactions by and between other entities.

26. Our purpose in setting up separate corporations for various aspects of our business interests is, to the extent provided by law, to protect and limit liability.

27. I have never used the corporate form to confuse or avoid creditors or for any other illicit purpose.

28. I believe that what happened in this case is that agents of Citizens did not know or understand the legal significance of the type of documents that they were handling. For that matter, I was personally unfamiliar with the type of financial transaction allegedly proposed by Holly. MJ would not agree to payment in full prior to delivery of goods in August, 2009 but was unable to do so because of Citizens negligence.

29. As a result of the December 17, 2009 offset of monies on deposit with Citizens Bank, MJ, MI and Select have been irreparably harmed.

30. Select has been harmed insofar as paychecks to employees have been dishonored. The business has been forced to access other cash reserves or borrow money in order to mitigate its damages and attempt to continue in business. Moreover, several checks which secure valuable space at trade shows have been dishonored.

31. It is the custom and practice within the trade show business that long standing customers with continuous presence at trade shows are awarded the most advantageous spots in the halls and convention centers where the trade shows are held. Failure to secure a spot by payment in a timely manner causes you to lose your preference and, therefore, your advantageous location at shows. These rights are highly valued and have either been established over the years by MJ or in the case of Select, purchased from a prior company. Citizens has now irreparably harmed Select's ability to maintain these valuable spots.

32. MI has been harmed as it has no access to operating capital.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23RD DAY OF DECEMBER, 2009.

_____
JAYME A. BARRO

710476